DA 10-0210

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 195

CLIFFORD G. LARSEN and PATRICIA P. LARSEN,

Plaintiffs, Counterdefendants,
Appellees, and Cross-Appellants,

v.

KENNETH RICHARDSON, JR., LORNA RICHARDSON,
DENNIS RUANA, JOYCE RUANA and all other persons,
unknown, claiming or who might claim any right,
title, estate or interest in or lien or encumbrance
upon the real property described in the complaint
adverse to the Plaintiffs' ownership or any cloud
upon Plaintiffs' title thereto, whether such claim
or possible claim be present or contingent,

Defendants, Counterclaimants, Appellants,
and Cross-Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-07-926
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Christopher W. Froines, Geiszler & Froines, P.C., Missoula, Montana

For Appellees:

Christopher B. Swartley, Attorney at Law, Missoula, Montana

Zane K. Sullivan, Sullivan, Tabaracci & Rhoades, P.C.,
Missoula, Montana

Submitted on Briefs:  January 12, 2011

Decided:  August 16, 2011

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Plaintiffs Clifford G. Larsen and Patricia P. Larsen (the Larsens) commenced this action in the Fourth Judicial District Court, Missoula County, seeking to quiet title to a 26.96-acre parcel of land. Defendants Kenneth Richardson Jr., Lorna Richardson, Dennis Ruana, and Joyce Ruana (collectively, the Richardsons) counterclaimed that they hold an easement by prescription over a portion of that land. Subsequently, the Richardsons amended their counterclaim to allege they own the northernmost 9.74 acres of the parcel outright, retaining their easement theory as an alternative ground for relief. Following a bench trial, the District Court ruled that the Larsens own the entire 26.96 acres and that the Richardsons do not hold a prescriptive easement. The District Court granted in part, and denied in part, the Larsens' request for costs and attorney's fees.

¶2 The Richardsons appeal and the Larsens cross-appeal, raising the following issues:

1. Did the District Court err in determining that the Larsens own the disputed 9.74 acres?

2. Did the District Court err in determining that the Richardsons do not hold a prescriptive easement?

3. Did the District Court err in denying the Larsens' request for attorney's fees?

4. Did the District Court err in denying the Larsens' request for certain costs?

We affirm as to Issues 1, 2, and 3. We reverse and remand as to Issue 4.

## BACKGROUND

### The Property in Dispute

¶3 In August 2003, the Larsens purchased approximately 400 acres of land enclosed by the bold line and designated "Parcel 1" on Diagram I below. (The diagrams displayed

3

herein are included in the record, with some labeling added and editorial modification for clarity.) This land is located northwest of the City of Missoula and is bounded along its east edge by LaValle Creek Road. The Richardsons own adjacent property (roughly 1,500 acres) to the north and west. Dougherty Ranch owns adjacent property to the east.

**DIAGRAM I**

¶4 Parcel 1 is situated primarily in Section 23 of Township 14 North, Range 20 West, Principal Meridian, Montana. It also extends east into Section 24 and then north into Section 13. When the Larsens filed this action, they sought to quiet title to the portion of Parcel 1 jutting up into Section 13, which is the shaded 26.96-acre finger of land on Diagram I above and the area enclosed by the letters C, F, E, and D on Diagram II below. The Richardsons did not contest the Larsens' ownership of the southern 17.22 acres. Rather, the dispute centered on the northern 9.74 acres, represented by crosshatching and enclosed by the letters B, F, E, and A on Diagram II.

4

# DIAGRAM II



approx. location of LaValle Creek

LaValle Creek Road

Section 13 east-west midsection line

F    E

disputed area →

APPROXIMATE LOCATION OF CORRALS

← approx. location of corrals

Richardsons

9.74 acres

Dougherty

B

A

FENCELINE

17.22 acres

↖ LaValle Creek Road

approx. location of LaValle Creek →

FENCELINE

C    D

Larsens

← LaValle Creek Road

¶5     The Richardsons' land to the west is used for pasturing cattle annually from May to October. Since the 1940s, the Richardson family and, in later years, the Richardsons' lessees have used some old corrals, a loading chute, and fences within the disputed 9.74 acres to move cattle to and from the Richardsons' land. Thus, the Richardsons claimed an easement to continue using the corrals and adjacent area (roughly 1.5 acres in total) as they had for the previous 60 years.

¶6     As noted, the Richardsons later added a claim of outright ownership of the 9.74 acres. This claim was premised on the fact that various deeds, dating back to 1910, describe the boundary between what is now the Larsens' property and the Richardsons'

property within Section 13 as a "line of fence" that proceeds northeasterly from Point C (*see* Diagram II) to a point where said fence "jogs" to the east across LaValle Creek to LaValle Creek Road. (The approximate course of LaValle Creek has been added to Diagram II.) This "jog" represents the northern boundary of the Larsens' finger of land. The Richardsons claimed that the existing fence from Point B to Point A is the "jog" referenced in the deeds. If correct, then they own the disputed 9.74 acres north of that fence. But if the "jog" is located further north, from Point F to Point E as the Larsens contend, then the Larsens own the 9.74 acres.

### The Deeds

¶7 At the end of 1909, all of Section 13 was owned by John R. Latimer. Latimer conveyed his ownership of Section 13 in three separate transactions. First, in 1910, he sold the portion of Section 13 now owned by the Richardsons, referred to herein as "the Richardson property," which is the area west of LaValle Creek Road except the finger of land. Second, in 1913, Latimer sold the portion of Section 13 now owned by Dougherty, referred to herein as "the Dougherty property," which is the area east of LaValle Creek Road. Third, in 1933, Latimer sold the portion of Section 13 now owned by the Larsens, referred to herein as "the Larsen property," which is the finger of land.

¶8 The subsequent deeds conveying the Dougherty property and the Larsen property contain boundary descriptions that are identical, in material respects, to the 1913 and 1933 deeds, respectively. As for the Richardson property, the 1910 deed describes the boundary without specific measurements, but the 1943 deed of that property, by which it was conveyed to the Richardson family, includes specific bearings and distances.

6

¶9    The synopsis of the deed language is as follows.  Diagram II is displayed again here for reader convenience.

**DIAGRAM II**



First, the boundary between the Richardson property and the Larsen property (within Section 13) begins at Point C and proceeds in a northeasterly direction along a line of fence to a point where said fence jogs to the east across LaValle Creek, thence easterly along the jog in the fence to LaValle Creek Road.  The 1910 deed of the Richardson property and all deeds of the Larsen property state that the "jog" is "near the center" of Section 13.  The courses provided in the 1943 deed of the Richardson property likewise indicate that the jog is near Section 13's east-west midsection line (*see* Diagram II).  The

1943 deed further states that the jog is 350 feet in length. The deeds to the Dougherty property and the Larsen property establish that the jog ends at the point where LaValle Creek Road crosses the east-west midsection line, which is therefore the northeast corner of the finger of land. All of this leads to the conclusion that the jog began approximately at Point F (which is 350 feet west of LaValle Creek Road on the midsection line) and ran east to Point E. In fact, there is no dispute that the deeds, "as they are written," place the jog from Point F to Point E. The Larsens' expert (James R. Weatherly, a licensed professional engineer with WGM Group, Inc.) and the Richardsons' expert (Ronald D. Milam, a professional land surveyor with DJ&A, P.C.) agreed on this point.

¶10    Nevertheless, Weatherly and Milam ultimately disagreed about the location of the jog. Weatherly maintained that it was from Point F to Point E, while Milam insisted that it was from Point B to Point A. This disagreement was based on existing conditions in the field. On one hand, there presently is a fence from Point C to Point B, which seemingly "jogs" over to Point A. In contrast, there is no fence presently running north from Point B to Point F to Point E. Furthermore, while there is evidence of old fencing north of Point B, it is unclear whether these remains were part of a prior boundary fence. On the other hand, however, there is no evidence that the B-to-A fence existed when the 1910 deed was written, and language in the various deeds indisputably puts the "jog" in the vicinity of Points F and E. Moreover, evidence introduced at trial indicates that the finger of land was understood to be 30 acres in size. If the jog is from Point F to Point E, then the finger works out to be 26.96 acres. But if the jog is from Point B to Point A, then the finger works out to be only 17.22 acres.

8

¶11     As fleshed out at trial, Milam's conclusion that the jog is from Point B to Point A is grounded in two propositions. The first is that the writers of the 1910, 1913, 1933, and 1943 deeds "did not know where [Section 13's] east-west midsection line was located upon the ground." Milam opined that there in fact was a fence from Point B to Point A in 1910, which the deed writers mistakenly thought was situated approximately on the midsection line; therefore, when they referred to a jog "near the center" of Section 13, they meant this fence. Essentially, Milam posited that the deed writers understood the midsection line to be 1,150 feet south of where it actually is, nearly halfway between the true midsection line and Section 13's southern boundary.

¶12     Milam conceded, however, that surveyors of the era could have established an accurate east-west midsection line. Weatherly testified to the same effect and noted that even if the deed writers got it wrong, "[w]e certainly wouldn't expect them to be eleven hundred and fifty feet off of that line." Weatherly pointed out that while the 1910 deed writers simply referred to a jog in the fence "near the center" of Section 13, the post-1910 deed writers went to the trouble of giving specific bearings and distances in order to nail down the boundaries more tightly. Weatherly attributed significance to the fact that they made this effort, and he disagreed with the notion that the deed writers were as mistaken as Milam suggested. Furthermore, Weatherly's research revealed that Latimer was involved in a boundary dispute in 1910 relating to other property he owned in the area and that he had gone to court to get the legal description of the property clarified. Weatherly, therefore, doubted Milam's assumption that Latimer was so careless as to sell his property in Section 13 with such dramatically incorrect legal descriptions.

9

¶13    The second proposition underlying Milam's approach is that the B-to-A fence is an "artificial monument" which has "a higher order of importance" than the bearings and distances stated in the deeds.  Surveyors retracing a metes-and-bounds[1] description are guided by a hierarchy or "priority of calls" in the event of a conflict between elements within the land description.  Monuments[2] generally control over inconsistent courses and areas (i.e., number of acres), the rationale being that the latter depend for their correctness on a variety of circumstances and, therefore, are generally less reliable than a monument established on the ground at the time of the survey.  *See* Walter G. Robillard & Lane J. Bouman, *Clark on Surveying and Boundaries* § 14:21, 397 (7th ed., Lexis Law 1997), § 15:08A, 147 (LexisNexis Matthew Bender Supp. 2010); Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* 121-23 (6th ed., John Wiley & Sons 2009).  Milam took the position that the B-to-A fence is a "jog" in the fence line; that it is thus a monument called for in the deeds; and, as such, that it controls over the bearings, distances, number of acres, and "near the center" language recited in the deeds. He therefore expressly "disregarded" any terms in the deeds that were inconsistent with the jog's being located between Points B and A.  Weatherly, in contrast, refused to treat the B-to-A fence as a controlling monument without any evidence that it was the "jog" to which the deed writers were referring, particularly when doing so would require disregarding the vast majority of descriptive language in the deeds.

---

[1] Metes and bounds:  "The territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties." *Black's Law Dictionary* 1080 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009).

[2] Monument:  "Any natural or artificial object that is fixed permanently in land and referred to in a legal description of the land." *Black's Law Dictionary* 1099.

10

**The Instant Lawsuit**

¶14 Based on the deeds and field measurements, Weatherly and his land surveyors completed a survey, ultimately recorded as Certificate of Survey 5900, depicting the exterior boundaries of the Larsens' property (*see* Diagram I). The survey showed the northern boundary of the finger of land from Point F to Point E, indicating that the Larsens own the disputed 9.74 acres. The Larsens provided a copy of the survey to the Richardsons in January 2005. By their own admission, the Richardsons believed it to be "true and accurate." They did not assert that they "owned" the area north of the B-to-A fence. Rather, they told the Larsens that they wanted to continue using the corrals and surrounding area for transporting cattle to and from their property. In a letter addressed to the Larsens, the Richardsons stated: "All we want is to use the existing corrals 4 or 5 times a year and be able to access our property which would be about 1 1/2 acres. We along with other neighbors have done this for the past several years with no problems." The parties considered a lease or a land swap, but when negotiations reached an impasse, the Larsens recorded Weatherly's survey (COS 5900) and notified the Richardsons that they intended to fence the property along the boundary lines shown on COS 5900. Concerned about liability exposure, the Larsens asked the Richardsons to remove the corrals and holding fences, which were in a dilapidated condition. The Richardsons refused, claiming a prescriptive easement.

¶15 The Larsens thus commenced the present action in July 2007. In February 2008, the Richardsons advised the District Court that they believed COS 5900 contained "major errors." They requested a four-month extension of discovery so that Milam could

examine the property, which could not be done while there was still snow on the ground. The District Court granted this request. Ultimately, Milam issued a report in June 2008 and a supplemental report in September 2009, offering the opinion that the property line of the Richardsons and the Larsens "is upon the existing fence line as in existence today" (i.e., from Point C to Point B to Point A), meaning that the Richardsons own the disputed 9.74 acres. Milam based this determination on where the fence, the jog, and the road can be found at present. He expressly "disregarded" all bearings, distances, and language in the deeds indicating that the jog is from Point F to Point E.

### The District Court's Decision

¶16 After the District Court denied the parties' cross-motions for summary judgment, the case proceeded to a bench trial in September and October 2009. Ten witnesses testified, including Weatherly and Milam. The District Court entered its Findings of Fact and Conclusions of Law and Order in March 2010.

¶17 First, the court found that despite minor differences in the language used, all deeds in the Richardsons' and the Larsens' chains of title describe the location of the jog in the fence as at or near the midsection of Section 13. The court observed that a fence presently existing at Section 13's midsection "is not necessary to determine the boundary, when the language describing the boundary can be traced back to 1910 and other information in the deeds places the boundary near the midsection of Section 13."

¶18 Next, addressing the Richardsons' claim that the B-to-A fence is the "jog" to which the deeds refer, the District Court observed that the location of this fence "does not match up with language and measurements placing the jog at the east-west midsection

12

line of Section 13 and does not comply with the legal description of Richardson's property as set forth in the 1943 grant." The District Court found that placing the jog at the B-to-A fence "would require the court to ignore and give no meaning to significant conflicting language contained in the deeds pertaining to the boundary."

¶19 The District Court observed that there is some onsite physical evidence of posts and wire near Section 13's east-west midsection line and north of Point B. The court found that the posts and wire could be the remains of a fence existing in 1910 (along the B-to-F-to-E lines on Weatherly's survey). As for a "jog" between Point B and Point A, the District Court observed that there "is no evidence that an east-west fence south of the cattle corrals existed in 1910. Aerial photos of the property are inconclusive."[3] The District Court further found that there "is no evidence that the existing [B-to-A] fence was built for purposes of delineating a property boundary. Instead, the evidence indicates that the fence was built for purposes of holding cattle for loading and off loading."

¶20 The District Court specifically found Weatherly's testimony to be "much more convincing" than Milam's testimony. Moreover, based on prior correspondence between the Richardsons and the Larsens, and as confirmed by the testimony of Cliff Larsen and Lorna Richardson at trial, the court observed that "[i]t is evident what the mutual mindset of the parties to this litigation was prior to the surveys. The mutual belief was that the lands upon which the corrals are located belong to the Larsens." The court noted that,

---

[3] Several aerial photographs were introduced at trial. The photographs were dated 1937, 1940, 1966, 1981, and 1996. As such, they provided no evidence of a fence prior to 1937. Moreover, the only evidence of a fence in the 1937 and 1940 photographs was the appearance of a change in vegetation in the vicinity of Points B and A. No actual fence posts could be discerned in the photographs due to the altitude.

13

according to tax records, the Larsens and their predecessors in interest have been paying taxes on the disputed 9.74 acres for over 100 years. The Richardsons, in contrast, have never paid taxes on that property. "It was only after the survey of Ron Milam that the Richardsons came to believe that they owned the land where the corrals are located." The court indicated that it found Milam's surveying approach to be "inept."

¶21 Lastly, as to the question whether the Richardsons hold a prescriptive easement, the District Court credited the testimony of Judith Anderson and Alex Polakow indicating that the Richardsons' use of the corrals and surrounding area was permissive. Anderson was the Larsens' predecessor in interest. She owned the Larsen property from 1990 to 2003. Her father, Walter L. Pope, owned the property from 1940 to 1969. Polakow was a groundskeeper for Pope in the 1950s and 1960s. According to Polakow, Kenneth Richardson Sr. requested and obtained permission from Pope to place a fence across the property near the corrals in order to increase the size of his holding area when loading cattle. Anderson testified (by deposition) that the corrals were located at a flat spot in the terrain where the county maintenance of LaValle Creek Road ended. She explained that it was more convenient for the Richardsons to load and offload cattle at that location, which Anderson and Pope permitted. In this regard, the Richardsons' 1,500 acres border LaValle Creek Road north of the corrals. In addition, their property has been accessible on the west side from Highway 93 since the 1960s. However, according to Roger Indreland (a neighboring rancher) and Lorna Richardson (one of the defendants in this case), the corrals were in place in the 1940s when the Richardsons first began using them—in fact, they were already "old" at that point—and it would have been "very

expensive" for the Richardsons to create an access point to their property north of the corrals. The District Court, therefore, found that Pope accommodated the Richardsons by giving them permissive use of the property for the ingress and egress of their cattle and by allowing the Richardsons to use the corrals located on his property.

¶22 In its Conclusions of Law, as to the competing claims of ownership, the District Court concluded that COS 5900 shows the correct boundary between the Richardson property and the Larsen property in Section 13. The court rejected Milam's contention that the B-to-A fence is an ascertained monument which takes precedence over all other language in the deeds. The court observed that the location of the "jog" referred to in the deeds is a factual issue, and there is no evidence showing that the B-to-A fence was the intended "jog" or that it even existed in 1910.

¶23 As to the prescriptive easement counterclaim, the District Court concluded that the Richardsons had failed to show their use of the disputed 9.74 acres was adverse. Instead, the court concluded that the Larsens had presented evidence showing the Richardsons' use of the corrals and surrounding area was a "neighborly accommodation" by Pope and, as such, was permissive.

¶24 In light of the foregoing, the District Court ordered that the Larsens are the owners of the property described by COS 5900 and that the Richardsons do not have a prescriptive easement over any portion of the Larsens' property. Thereafter, the Larsens filed a Bill of Costs and a separate Motion to Assess Attorney's Fees. The District Court awarded some of the requested costs and denied others. The court also denied the request for attorney's fees in its entirety. The Richardsons appeal the District Court's rulings

against them regarding their ownership and prescriptive easement claims, and the Larsens appeal the District Court's denial of attorney's fees and certain costs.

**STANDARDS OF REVIEW**

¶25 We review the factual findings of a trial court sitting without a jury to determine whether the findings are clearly erroneous. *Eldredge v. Asarco, Inc.*, 2011 MT 80, ¶ 30, 360 Mont. 112, 252 P.3d 182; M. R. Civ. P. 52(a). A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Eldredge*, ¶ 30. In determining whether substantial evidence supports the trial court's findings, we view the evidence in the light most favorable to the prevailing party. *Guthrie v. Hardy*, 2001 MT 122, ¶ 24, 305 Mont. 367, 28 P.3d 467. Furthermore, due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. M. R. Civ. P. 52(a). It is the province of the trial court to weigh the evidence and resolve any conflicts between the parties' positions, and this Court will not second-guess the trial court's determinations regarding the strength and weight of conflicting testimony. *State v. Lally*, 2008 MT 452, ¶ 22, 348 Mont. 59; 199 P.3d 818. Lastly, we review a trial court's conclusions of law de novo, to determine whether the court's interpretation of the law is correct. *Eldredge*, ¶ 30; *Stanley v. Lemire*, 2006 MT 304, ¶ 52, 334 Mont. 489, 148 P.3d 643. This includes the trial court's interpretation and application of a statute. *Patrick v. State*, 2011 MT 169, ¶ 11, ___ Mont. ___, ___ P.3d ___ ("A district court's interpretation and application of a statute is a conclusion of law that this Court reviews for correctness.").

16

## DISCUSSION

¶26 *Issue 1. Did the District Court err in determining that the Larsens own the disputed 9.74 acres?*

¶27 The Richardsons (more specifically, their counsel) commence their opening brief on appeal with the statement: "The question before the Court is whether the property the Richardsons have owned, used and maintained since 1943 should be taken away from them." This statement, apparently designed to engender sympathy for the Richardsons' plight, is patently misleading. That is *not* the question before this Court, nor has it ever been the question in this case. The question, rather, is whether the Richardsons (or the Larsens) own the disputed property in the first place. As the District Court found, the Richardsons' belief was that the land upon which the corrals are situated belongs to the Larsens. Their response upon seeing COS 5900—which they believed to be "true and accurate"—was not that they *own* the area north of the existing B-to-A fence, but that they have a right to continue *using* the area (approximately 1.5 acres) for loading and offloading cattle. As the Richardsons stated in a March 2006 letter to the Larsens: "All we want is to use the existing corrals 4 or 5 times a year and be able to access our property which would be about 1 1/2 acres. We along with other neighbors have done this for the past several years with no problems." It was only after Milam generated his opinion about the B-to-A fence that the Richardsons claimed they own the land north of that fence. The question remains whether Milam's analysis is legally correct.

¶28 In this regard, the Richardsons contend that the District Court "misapplied the rules of deed construction" and made "numerous reversible errors" in its findings of fact

17

and conclusions of law. The Richardsons' brief is a virtual laundry list of alleged errors. Yet, the Richardsons utterly fail to present a cogent analysis explaining why, under the facts and the law, they own the disputed 9.74 acres and the Larsens do not. Their arguments are disjointed, conclusory, and ultimately without merit.

¶29 For starters, the Richardsons shoot themselves in the foot with repeated citations to the following legal principle: " 'In an action to quiet title or remove a cloud thereon the general rule is that plaintiff must succeed on the strength of his own title and not on the weakness of his adversary's, except where the parties claim title from a common source. Want of title in plaintiff renders it unnecessary to examine that of defendant.' " *McAlpin v. Smith*, 123 Mont. 391, 395, 213 P.2d 602, 603-04 (1950) (quoting 51 C.J. *Quieting Title* § 73). The Richardsons assert that the Larsens must establish ownership based strictly on the deed they received from Judith Anderson in 2003 and that it is improper to consider any "weaknesses" in the Richardsons' chain of title.[4]

¶30 The first problem with this argument is that it cuts both ways. The Richardsons contend that the Larsens "cannot prove ownership based on their own deed, [and thus] their case should be dismissed *with ownership of the disputed property vested in the Richardsons*" (emphasis added). However, the failure of the Larsens' claim would not, *ipso facto*, establish ownership in the Richardsons. The Richardsons filed a counterclaim asserting ownership of the disputed 9.74 acres, yet at no point have they demonstrated, based "on the strength of [their] own title and not on the weakness of [their] adversary's,"

---

[4] The Larsens and the Richardsons disagree as to whether they "claim title from a common source." We do not address this question, however, as it is unnecessary to do so for the reasons which follow.

that they own this property. And in fact, the language of the 1943 deed by which the Richardson family acquired their property in Section 13 indisputably puts the "jog" near Section 13's midsection line, in the vicinity of Points F and E. In other words, the Richardsons themselves cannot succeed on the strength of their own title insofar as their claim of ownership is concerned. Hence, under the Richardsons' argument based on *McAlpin*, neither they nor the Larsens would own the disputed 9.74 acres. Rather, that property would still be vested in Latimer.

¶31 Furthermore, the Richardsons' reliance on *McAlpin* is not well taken. The Larsens hired a surveying firm to conduct a retracement survey of the exterior boundaries of their property. The Richardsons then hired their own surveyor to review that retracement survey. Both Weatherly and Milam began their respective analyses by, first, obtaining the deeds in the Larsens' chain of title and the chains of title of the adjacent landowners (Dougherty and the Richardsons). This is standard practice in conducting a retracement survey, as both Weatherly and Milam testified. *See also* Robillard & Bouman, *Clark on Surveying and Boundaries* § 14:21, 397 (1997) ("In ascertaining the true and correct boundaries of a parcel, the surveyor is obligated to consider any and all evidence. This rule is inflexible.").[5] Weatherly and Milam reached their ultimate conclusions regarding the boundaries based on the language of the deeds in all three chains of title. Thus, the

---

[5] At trial, Weatherly and Milam testified that they rely on, or are guided by, three so-called "bibles" of surveying: Curtis M. Brown, Walter G. Robillard, & Donald A. Wilson, *Evidence and Procedures for Boundary Location*; Walter G. Robillard & Lane J. Bouman, *Clark on Surveying and Boundaries*; and Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles*. These treatises, therefore, offer helpful insights concerning the issues addressed herein and are cited as persuasive authority.

Richardsons' criticisms of the Larsens and the District Court for considering the deeds to the Richardson property in their respective boundary analyses rings hollow, given that the Richardsons and their expert did the very same thing in their boundary analysis.

¶32 In any event, the Larsens *can* prove ownership based on their own deed, and this case, therefore, does not involve an attempt to establish ownership through "weaknesses" in an adversary's title. The object of all rules for the establishment of boundaries is to ascertain the actual location of the boundary as made at the time. *Karlson v. Rosich*, 2006 MT 290, ¶ 14, 334 Mont. 370, 147 P.3d 196. As to boundary disputes, the primary purpose is to track the footsteps of the original surveyor, to locate the survey as it was intended to be located on the ground by him. *Karlson*, ¶ 14; *see also Olson v. Jude*, 2003 MT 186, ¶ 39, 316 Mont. 438, 73 P.3d 809. Although, in the present case, the deeds to the Section 13 properties were prepared without the benefit of a proper field survey, we conclude that the foregoing principles nevertheless apply in determining the locations of the boundaries described in those deeds. In other words, the duty is to track the courses laid out by the deed writers in the boundary descriptions.

¶33 In the 2003 deed from Anderson to the Larsens, the boundary of the finger of land is described as starting at a point 588 feet east of Section 24's northwest corner (Point C on Diagram III below), and then proceeding through three courses:

> **Course 1.** "thence continuing in a Northeasterly direction along a line of fence to a point near the center of Section 13 where said fence jogs to the East across [LaValle] Creek to the [LaValle] Creek road";

> **Course 2.** "thence Easterly to a point 2880 feet West of the quarter corner of Sections 13 and 18";

**Course 3.** "thence in a Southwesterly direction along the East side of said [LaValle] Creek Road to a point 1403 feet West of the quarter corner of Sections 24 and 13" (Point D on Diagram III).

Regarding Course 2, note that the eastern boundary of Section 13 is also the western boundary of Section 18 in the neighboring township. Hence, "the quarter corner of Sections 13 and 18" is the quarter corner on the east side of Section 13.

### DIAGRAM III



¶34 Tracking these courses, there first is a fence running northeasterly from Point C to Point B. At that point, the northeasterly fence line ends. There is a fence from Point B to Point A, which is an ostensible easterly "jog," but this B-to-A fence is situated roughly halfway between Section 13's midsection line and southern boundary and, thus, cannot

21

fairly be characterized as "near the center of Section 13." Moreover, the deed states that upon reaching the jog, the next courses are easterly across LaValle Creek to a point 2,880 feet west of the quarter corner of Sections 13 and 18, and then southwesterly along LaValle Creek Road. These two courses indicate that the northeast corner of the jog is at the point where LaValle Creek Road crosses Section 13's midsection line (Point E) and that the jog begins somewhere westerly of that point. Accordingly, the language of the Larsens' deed establishes that the boundary line continues north from Point B, eventually reaching a point on the west side of LaValle Creek near Section 13's midsection line, and then proceeds easterly across the creek to Point E. This means that the corrals—which are located east of the creek, next to LaValle Creek Road, about 600 feet south of the midsection line—are undeniably on land owned by the Larsens.

¶35    The only matter left for determination is the precise location of the finger's western and northern boundary lines, which ran along a fence northeasterly from Point B and then easterly across the creek to Point E.[6] To that end, for the proper construction of a deed, the circumstances under which it was made or to which it relates, including the situation of the subject of the deed and of the parties to it, may be shown so that the judge is placed in the position of those whose language the judge is to interpret. Sections 1-4-102, 70-20-202(2), MCA; *see also Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶¶ 41-55, 338 Mont. 41, 164 P.3d 851 (discussing

---

[6] While the fence's location presumably was apparent in 1910 when it was first referenced for boundary purposes, the difficulty now, over 100 years later, is determining where the fence was, which prompted the trial judge in this case to remark: "I think that it ought to carry a term of imprisonment for any surveyor who uses a fence line in a deed." If there were a case justifying such a punishment, this would surely be it.

§ 1-4-102, MCA).  When a property description " 'alludes to facts beyond the deed, parol evidence may be offered, not to contradict the description, but to locate the deed upon the land.' " *Baker Revocable Trust*, ¶ 43 (quoting *Donnell v. Humphreys*, 1 Mont. 518, 526 (1872)).  Here, the 2003 deed refers to a fence running northeasterly from Point C and then, near the center of Section 13, jogging easterly to the point where LaValle Creek Road crosses the east-west midsection line (Point E).  However, while there is evidence of old fencing (posts and wire) north of Point B, this evidence is not sufficient to establish the route of the former boundary fence.[7]  It thus is necessary and appropriate to examine other deeds in the Larsens' and the adjacent property owners' chains of title, and any other pertinent evidence, in order to locate the 2003 deed upon the land and to ensure that the retraced boundary line does not encroach upon the property of neighboring landowners.  Doing so, the 1943 deed of the Richardson property states that the "jog" is 350 feet in length.  Hence, Weatherly measured 350 feet west from Point E, set the resulting point (Point F) as the northwest corner of the finger, and then drew a straight line from Point B to Point F.[8]

¶36    In the absence of an ascertainable fence line on the ground north of Point B, the lines drawn by Weatherly from Point B to Point F and Point F to Point E are a reasonable

---

[7] According to a 2006 report issued by the Missoula County Survey Office (which is part of the record in this case), a "severe flood event" occurred in the LaValle Creek drainage some years ago due to an ice dam and subsequent sudden release of water.  In light of this information, Weatherly opined that there may have been other fence posts in the vicinity of Points B and F that have since been washed out.

[8] There is no dispute that at the east end of the jog, whether Point E or Point A, the boundary of the finger then proceeds southwesterly along LaValle Creek Road through Point D.  Dougherty and the Larsens executed an agreement establishing the boundary between their properties within Section 13 as LaValle Creek Road's centerline.

course to follow in rounding out the western and northern boundaries of the finger, based on the evidence available. *See* Robillard & Bouman, *Clark on Surveying and Boundaries* § 15:08, 124 (Supp. 2010) ("When a surveyor is unable to follow the precise 'footsteps' of his or her predecessor, then a surveyor must attempt to track the original surveyor's work using whatever recoverable evidence that exists."); Curtis M. Brown, Walter G. Robillard, & Donald A. Wilson, *Evidence and Procedures for Boundary Location* 42 (2d ed., John Wiley & Sons 1981) ("Discovery of the original monument itself is not a necessity, since many types of evidence can be resorted to that will suffice as proof of the original location."). In fact, Milam followed the same course (B to F to E) when he drew the common boundaries of the Richardson, Dougherty, and Larsen properties on a topographic map of Section 13, based on his analysis of the deeds "as they are written." The Richardsons present no compelling argument to the contrary. Rather, they maintain that the boundary line simply does not continue north from Point B at all. They make several arguments in this regard.

¶37 First, the Richardsons seek to invalidate the 2,880-foot call in the Larsens' deed, which provides: "thence Easterly [along the jog in the fence] to a point 2880 feet West of the quarter corner of Sections 13 and 18; thence in a Southwesterly direction along the East side of said [LaValle] Creek Road . . . ." This language is the basis for establishing Point E as the finger's northeast corner. The Richardsons point out that the distance from the quarter corner of Sections 13 and 18 (i.e., from Section 13's east quarter corner) to the point where LaValle Creek Road crosses the east-west midsection line (Point E) is

24

actually 3,087 feet, not 2,880 feet, a discrepancy of 207 feet (*see* Diagram IV below).

The Richardsons, therefore, characterize the 2,880-foot dimension as an "errant" call.

**DIAGRAM IV**



Notably, Weatherly and Milam offered several possible explanations for this discrepancy:

(1) the deed writers measured the distance from Section 13's east quarter corner to the

road incorrectly[9]; (2) the *original* monument at the east quarter corner, which the deed

writers theoretically relied on, was situated 207 feet farther west (closer to the road) than

the *second-generation* monument at the east quarter corner, which Weatherly and Milam

---

[9] *See* Robillard & Wilson, *Brown's Boundary Control and Legal Principles* 103 ("The retracing surveyor should realize that the referenced or recorded measurements probably were 'estimated.' The authors have no personal knowledge that the early surveyors carried tape measures to measure the length of posts or diameter tap or calipers to measure tree diameters. A surveyor's outstretched hand was considered as 6 inches from thumb to little finger, the width of the thumb nail was 1 inch, a step was 3 feet, a pace was 6 feet. Today these references do not translate to exact measurements.").

relied on[10]; or (3) the 2,880-foot dimension was "an office calculation," rather than a ground measurement.[11] But regardless of the reason for the discrepancy, the deeds to the Larsen property (dating back to 1933) and the deeds to the Dougherty property (dating back to 1913) plainly contemplate being "along the east side of [LaValle Creek Road]" at the point 2,880 feet west of Section 13's east quarter corner. It is undisputed that the road existed in 1913, and Weatherly's and Milam's research indicates that the road's location has not changed. The fact that the road is actually 3,087 feet from the quarter corner does not defeat the validity of the 2,880-foot call, or justify "disregarding" it entirely, when it is clear from surrounding language that the 2,880-foot measurement was understood to correspond with the point where the road crosses the midsection line. The 2,880-foot call was intended as a reference—albeit with an inaccurately measured or calculated distance—to the crossing point; and Point E, therefore, is a valid interpretation of the deeds.

¶38 Next, the Richardsons take the position that "near" is "a relative term without positive or precise meaning" and that the B-to-A fence "is more 'near' the mid-section line than it is to the south section line." This argument is absurd, and we reject it for the reasons given by the District Court. At trial, the Richardsons' counsel asked Milam

---

[10] The 1870 surveyor of Section 13 placed stone monuments at the quarter corners. The original monument at the *west* quarter corner still exists; however, surveyors in 1972 were unable to locate the original monument at the *east* quarter corner. Thus, they established a second-generation monument at that quarter corner, which may be in the same exact location as the original monument, but more than likely is not.

[11] Regarding the third possibility, which Weatherly and Milam seemed to think was most likely, the perimeter dimensions of Section 13 vary from a standard 5,280-foot mile due to the equipment available in 1870 when the section lines were established, and thus office calculations based on record dimensions were not always accurate.

whether "since 'near' is an imprecise term, isn't it also true that [the B-to-A fence] is closer to the midsection line than it is to the south section line?" Milam agreed with this statement, which prompted the trial judge to interject: "Do you believe that a land surveyor—registered land surveyor—would call [the B-to-A fence] near the center of that section?" (Recall that this fence is 1,150 feet south of the midsection line, nearly halfway between the midsection line and Section 13's southern boundary.) Milam responded, "It's near, yes. It's nearer to the center than it is to the [south] section line." The judge observed that this "defies logic." He pointed out that the B-to-A fence is "a long way from the center of that section, you know, and you would describe it some way else, if it's that far away. You would describe it in a measurement or something. But you can't just say, nearer the center of a section, when it's that far off."

¶39    It should also be noted that the term used in the deeds is "near" the center of Section 13, not "nearer" the midsection line than the southern boundary. This is not the only instance, however, in which Milam distorted deed language in order to prove the Richardsons' claim. The 1943 deed of the Richardson property describes the eastern boundary of that property as starting at Point C and then proceeding through five courses:

> **Course 1.**    "thence running in a Northeasterly direction along a line of fence bounding said tract on the East, North twenty-nine (29) degrees East, a distance of three thousand (3000) feet";
>
> **Course 2.**    "thence following along said fence where it jogs to the East across LaValle Creek, North Eighty-four (84) degrees East, a distance of three hundred and fifty (350) feet";
>
> **Course 3.**    "thence running North fourteen (14) degrees East, a distance of three hundred and sixty (360) feet along said fence";

27

**Course 4.** "thence running North thirty (30) degrees East along the fence on the Western Boundary of the County Road a distance of four hundred (400) feet";

**Course 5.** "thence running North thirty-nine (39) degrees East in a Northeasterly direction along said fence on the Western Boundary of said County Road a distance of two thousand five hundred and seventy-five (2575) feet to a point on the North line of said Section Thirteen (13), a distance of nine hundred and ten (910) feet West of the Northeast corner of said Section Thirteen (13)."

Each course is shown below on Diagram V as a dashed line bounded by two black dots.

**DIAGRAM V**



¶40    Milam asserted that Courses 2, 3, and 4 "closely fit" the B-to-A fence and the first two northerly courses along the existing westerly LaValle Creek Road fence line, which

28

suggests that the "jog" (Course 2) is between Points B and A.  He conceded, however, that in order to obtain this "close fit," he disregarded the bearings (i.e., "north X degrees east") in Courses 2, 3, and 4, and he disregarded Courses 1 and 5 altogether (on the ground that the deed writers were mistaken as to the location of Section 13's midsection line).  Milam also ignored the fact that the westerly LaValle Creek Road fence line has been moved and rebuilt twice since 1943, and he attributed no significance to the fact that the B-to-A fence is presently 361 feet, not 350 feet.

¶41    Obviously, boundary descriptions can be made to "closely fit" anything on the ground if some of the dimensions are disregarded and others are modified to achieve a preferred outcome.  The fact is that none of the bearings and distances stated in the deeds to the Section 13 properties matches existing ground conditions exactly.  As Milam and Weatherly explained, this could be due to a variety of factors such as measurement errors in the field and calculation errors in the office (by the deed writers).  In any case, it is undisputed that the general path of the boundary described in the 1943 deed is consistent with the language of the other deeds placing the "jog" in the vicinity of Points F and E.

¶42    As for Milam's proposition that the deed writers were mistaken as to the location of the midsection line, there is no evidence of this.  Indeed, this theory is based entirely on supposition:  the deeds refer to a jog; the only jog found is from Point B to Point A; Courses 2, 3, and 4 in the 1943 deed "closely fit" the B-to-A fence (when certain bearings and distances are ignored); and therefore the deed writers were confused.  We refuse to adopt as a principal of law the rule that if a surveyor is unable to find conclusive physical evidence of a boundary fence at the location described in a 100-year-old deed, but is able

29

to manipulate deed language to fit a fence at a different location, then the deed writers must have been confused and their bearings, distances, and other descriptive language can all be disregarded. Such a rule could potentially call into question the validity of countless land titles. To be sure, it might be shown in a particular case that the deed writer or surveyor was mistaken about the true location of a given line. But in the present case, Milam acknowledged that the deed writers knew where the perimeters of Section 13 were located on the ground. In fact, the 588-foot and 1,403-foot measurements in the deeds, describing the locations of Points C and D, respectively, on Section 13's southern boundary, are nearly exact. The notion that the deed writers then blundered dramatically concerning the location of the midsection line is implausible. As Weatherly observed, "[w]e certainly wouldn't expect them to be eleven hundred and fifty feet off of that line." Presuming such a gross error requires a much greater showing than Milam has proffered here.

¶43 Lastly, the Richardsons invoke the "priority of calls" mentioned above (*see* ¶ 13). Citing § 70-20-201(2), MCA, they assert that monuments are paramount and control over other evidence. They contend, therefore, that the 2003 deed of the Larsen property must be applied according to the monuments called for in the deed, which they list as a fence running northeasterly from Point C to a jog fence, the jog fence, and the fence along LaValle Creek Road. Applying this theory to presently existing objects in the field, they assert that the boundary is from Point C to Point B to Point A to Point D, notwithstanding the bearings, distances, acreages, and other descriptive language in the deeds indicating that the boundary is from Point C to Point F to Point E to Point D.

¶44    The Richardsons' approach is contrary to the law of surveying and without any evidentiary foundation. "If there were any principle that perhaps is misinterpreted and possibly misapplied by surveyors, attorneys, and courts, it is the priority of calls." Robillard & Wilson, *Brown's Boundary Control and Legal Principles* 92. The priority of calls was developed through caselaw in the 1800s and is also governed by statutory law. The general hierarchy is as follows: lines actually run on the ground by the creating surveyor prevail over natural monuments (e.g., a tree), which prevail over artificial monuments (e.g., surveyor's stakes), which prevail over references to adjoining boundaries (e.g., "to Hunter's property line"), which prevail over directions (e.g., northwest), which prevail over distances (e.g., 30 feet), which prevail over area (e.g., 5 acres), which prevails over place names (e.g., "the Quinn farm"). Robillard & Bouman, *Clark on Surveying and Boundaries* § 14:21, 397 (1997), § 15:08A, 147 (Supp. 2010); Robillard & Wilson, *Brown's Boundary Control and Legal Principles* 121-23; *Pollard v. Shively*, 5 Colo. 309, 313 (1880); *Riley v. Griffin*, 16 Ga. 141, 147-48 (1854); *M'Clintock v. Rogers*, 11 Ill. 279, 296-97 (1849); *Tewksbury v. French*, 6 N.W. 218, 218-19 (Mich. 1880); *Hoffman v. Beecher*, 12 Mont. 489, 502, 31 P. 92, 96 (1892); *Lodge v. Barnett*, 46 Pa. 477, 484-85 (1864). These rules "gr[ew] out of the peculiar exigencies of the country, and were moulded by experience, to meet the demands of justice." *Riley*, 16 Ga. at 148; *see also Booth v. Upshur*, 26 Tex. 64, 70 (1861) (the rules are "founded on reason, experience and observation" and "pertain[ ], not to the admissibility, but to the weight of evidence"). The rationale is that that the lower-ranked calls are generally less reliable than the higher-ranked calls. As explained by the court in *Riley*, 16 Ga. at 148,

31

"any natural object, when called for distinctly, and satisfactorily proved—and the more prominent and permanent the object, the more controlling as a locator—becomes a landmark not to be rejected, because the certainty which it affords, excludes the probability of mistake," whereas "course and distance, depending, for their correctness, on a great variety of circumstances, are constantly liable to be incorrect. Difference in the instrument used, and in the care of surveyors and their assistants, lead to different results." *See also McCullough v. Absecon Beach Co.*, 21 A. 481, 487 (N.J. Ch. 1891).

¶45    The priority of calls is not absolute, however, and a lower-ranked call may prevail over a higher-ranked call if the circumstances show that the lower-ranked call is the more reliable evidence of the boundary's true location. George W. Thompson, *Real Property* vol. 6, § 3044, 571-75 (1962) ("[M]onuments, as a general rule, prevail over courses and distances . . . unless the result would be absurd and one clearly not intended, or all the facts and circumstances show that the call for course and distance is more reliable than the call for monuments." (footnotes omitted)); *Booth*, 26 Tex. at 70 ("Still, the lowest grade, to wit, course or distance, is made to prevail over the highest grade, to wit, rivers, creeks, etc., when, upon applying the calls of the grant to the land, the surrounding and connected circumstances adduced in proof to explain the discrepancy, show that course or distance is the most certain and reliable evidence of the true locality of the grant."); Robillard & Bouman, *Clark on Surveying and Boundaries* § 15:08, 429 (1997) ("Although area is the lowest ranking element, if the instrument conveyed an exact area of one acre, then area would be the controlling element, and lines and monuments would probably yield . . . .").

¶46    As aptly stated by the Supreme Court of Tennessee:

> The general rule is that in determining boundaries resort is to be had, first, to natural objects or landmarks, because of their very permanent character, next, to artificial monuments or marks, then to boundary lines of adjacent owners, and then to courses and distances. But this general rule, as to the relative importance of these guides to the ascertainment of a boundary of land, is not an inflexible or absolute one.
>
> The use of the rule is as a means to the discovery of the intention of the parties. To arrive at the intention of the parties to the instrument is the purpose of all rules of construction, and this applies to the description of premises conveyed as well as to other parts of the instrument.
>
> *It is not true, as appellant supposes, that there is such magic in a monument called for that it will be made to control in construction invariably. If it controls it is only because it is to be regarded as more certain than course or distance.*
>
> "If it should in a given case be less certain, the rule would fail with the reason for it and the monument would yield to the course and distance and an artificial monument will yield more readily than a natural one." Note 30 Am. Dec. 734, 740.

*Pritchard v. Rebori*, 186 S.W. 121, 122 (Tenn. 1916) (emphasis added).

¶47    Likewise, it has been said that

> [t]he order of application a surveyor should consider and the attorney should apply is not an absolute rule of application to determine where the "true and correct" location of the disputed boundary line(s) was originally placed. If, in conducting a retracement, the surveyor encounters possibly conflicting interpretations of the evidence indicated and then recovered, preference should be towards that decision which best fits the majority of the recovered evidence—in other words the decision that has the fewest number of conflicting elements. The final decision accepted should then best reflect what the original intent was in the conveyance. This philosophy should not be a problem to either the surveyor, the attorney, or the court, even though it may be that an element lower in the scale is given preference over one placed in a higher ranking.

Robillard & Bouman, *Clark on Surveying and Boundaries* § 15:08A, 146 (Supp. 2010);

*see also Stuart v. Coldwell Banker & Co.*, 552 S.W.2d 904, 909 (Tex. App.—Houston 1st

Dist. 1977) (In the construction of the property description, "the trial court was not bound

to give controlling effect to every call in the field notes, or even to strictly follow the ordinary priority of calls. Circumstances may vary their usual order of dignity." (citations omitted)); *S.R.H. Corp. v. Rogers Trailer Park, Inc.*, 252 A.2d 713, 717 (N.J. 1969) (" 'These preferences [for monuments over courses and distances] are merely constructional preferences and will yield to the manifest intent of the grantor if this can be ascertained.' " (quoting Thompson, *Real Property* vol. 6, § 3044, 575)).

¶48 Montana law governing the interpretation of contracts[12] similarly provides that "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. Furthermore, "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA.

¶49 For these reasons, Milam and the Richardsons are incorrect in their contentions that monuments are always paramount. A monument controls only if it can be regarded as more certain than other calls ranked lower in the hierarchy. Furthermore, a boundary determination should best reflect the original intent of the parties to the conveyance, and preference should be for the determination that best fits the majority of the recovered evidence. In this regard, Weatherly testified that when a surveyor draws up a survey and puts it of record, it is "a compilation of all the evidence that's available to the surveyor at the time that the survey is completed," including the deeds, field observations, and

_____

[12] "Grants are to be interpreted in like manner with contracts in general, except so far as is otherwise provided in this part." Section 70-1-513, MCA.

interviews with persons having knowledge of the property. He acknowledged that there is a hierarchy of survey evidence, meaning that certain types of evidence generally carry more weight than other types, but he emphasized that this does not mean anything below the highest piece of evidence may be disregarded outright. More to the point, when asked whether fences, jogs, roads, and creeks have priority over bearings and distances, Weatherly stated: "If I have reason to believe that they were in the location where they may have been at the time the conveyance, or legal description, was prepared." Here, he observed, there is no evidence that the B-to-A fence existed in 1910.

¶50 Milam also testified on this subject. He stated that a monument controls if it has been "undisturbed." He also conceded that if the B-to-A fence did not presently exist, "I would consider the east-west midsection line" as the northern boundary of the finger. His boundary determination, therefore, depends on the premise that the B-to-A fence existed in 1910 and was the intended "jog" across the creek (as opposed to another "jog" further north)—a premise for which there admittedly is no evidence. It is stated in Robillard & Bouman, *Clark on Surveying and Boundaries* § 15:10, 434 (1997), that "[i]n order to rely on a fence as the true and correct dividing line, the fence itself must be supported by testimony or parol evidence indicating the fence was built on the correct original line." Milam testified that he agreed with this rule, and when asked what testimony or parol evidence he was relying on for his conclusion that the B-to-A fence is the "jog," Milam stated: "It's been maintained as a property line, and observed by the adjacent landowners for many years." He admitted under further questioning, however, that there had been no testimony by any person that this fence was built "on the original correct line." Later,

35

when asked again what corroborating evidence he had to establish that the B-to-A fence is anything other than a fence, Milam merely responded: "I have the deed." Yet, he acknowledged that the deeds, "as they are written," place the jog 1,150 feet north of the B-to-A fence, on or near the midsection line.

¶51 We addressed a similar situation in *Pilgrim v. Kuipers*, 209 Mont. 177, 679 P.2d 787 (1984), where the claim was that "the old 'fox farm' fence" was a monument that established the boundary. We disagreed, explaining:

> There is a critical distinction between a fence which establishes a boundary line, and a fence that merely separates one side of the fence from the other. The former is a monument as well as a fence, while the latter is merely a fence. Unlike the highway right-of-way and the Beaverhead River, there are no calls in the legal description to the "fox farm" fence. There is no evidence that the fence line was surveyed or that the fence was built to conform to a surveyed line. One witness testified that the fence was built zig-zag apparently around trees and without any pattern at all. Another said it "jogged" by as much as 20 feet. In contrast, the legal description calls for a straight line. There simply is no evidence to support the fence as a monument.
>
> Nor does a fence establish a boundary line when it does not conform to the true line, even though the property owners thought it was the boundary. Where two adjoining properties are divided by a fence, which both owners suppose to be on the line, such fence is a division fence, as between them, until the true line is ascertained, when they must conform to the true line.

*Pilgrim*, 209 Mont. at 181-82, 679 P.2d at 790 (internal quotation marks omitted).

¶52 Likewise, here, the legal description in the 2003 deed of the Larsen property—and in all other deeds in the Larsens' and the Richardsons' chains of title—calls for a fence near the center of Section 13, not halfway between Section 13's midsection line and southern boundary. There is no language in any of the deeds indicating that a fence 1,150 feet south of the midsection line is the intended "jog." For that matter, there is no

36

evidence that the B-to-A fence existed in 1910 or was built on the correct original line, and none of the lay witnesses called by the Richardsons had any actual knowledge of the correct boundary lines of the finger of land.

¶53 The fact is Milam had no evidentiary basis whatsoever for relying on the B-to-A fence as the true and correct dividing line. It was manifestly wrong, therefore, for him to treat this fence as a controlling monument called for in the deeds and, on this basis, to negate the vast majority of descriptive language in the deeds. Application of the priority of calls is not one of "pick and choose" or "pick the one I want to suit the answer I need." Robillard & Bouman, *Clark on Surveying and Boundaries* § 15:08A, 148 (Supp. 2010). Unfortunately, however, that is what Milam did here.

¶54 The Richardsons' reliance on § 70-20-201, MCA, is, thus, misplaced. The statute lists rules of construction for resolving inconsistencies in the descriptive part of a conveyance of real property. *Pilgrim*, 209 Mont. at 180, 679 P.2d at 789; *cf.* Robillard & Wilson, *Brown's Boundary Control and Legal Principles* 121 (The priority of calls is a rule of construction that applies "only in cases of conflict between elements within a land description."). The rules apply "when the construction is doubtful and there are no other sufficient circumstances to determine it." Section 70-20-201, MCA. Here, however, the only doubtful aspect of the 2003 deed is the precise route of the fence line between Point B and Point E, which is resolved, under the authority of § 70-20-202(2), MCA, by the second course in the 1943 deed of the Richardson property defining the jog as 350 feet in length. Furthermore, the Richardsons rely specifically on the rule that boundaries and monuments are paramount. Section 70-20-201(2), MCA. Yet, this rule applies only

"[w]hen permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces," § 70-20-201(2), MCA, and here, because the fence from Point B to Point A has not been established as a "monument" called for in the deeds, there is no "inconsistency" to be resolved by resort to the priority of calls, and the B-to-A fence cannot be "paramount."

¶55   In sum, the Richardsons have failed to show any error in the District Court's findings and conclusions concerning the ownership issue. Weatherly's survey is based on a correct application of the law and surveying standards. The Larsens demonstrated they own the disputed 9.74 acres. Milam's analysis, in contrast, is factually and legally unsupported, and the Richardsons have no basis for claiming ownership of that land.

¶56   *Issue 2. Did the District Court err in determining that the Richardsons do not hold a prescriptive easement?*

¶57   The burden at trial on a party seeking to establish an easement by prescription is to show, by clear and convincing evidence, open, notorious, exclusive, adverse, continuous, and uninterrupted use of the claimed easement for the full statutory period, which is five years. *Leichtfuss v. Dabney*, 2005 MT 271, ¶ 24, 329 Mont. 129, 122 P.3d 1220; *Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259. All elements must be proved because one who has legal title should not be forced to give up what is rightfully his without the opportunity to know that his title is in jeopardy and that he can fight for it. *Heller*, ¶ 15. If the claimant shows open, notorious, exclusive, continuous, and uninterrupted use, a presumption arises that the use was also adverse and the burden shifts to the landowner to establish that the claimant's use was permissive. *Heller*, ¶ 15;

38

*Albert v. Hastetter*, 2002 MT 123, ¶ 20, 310 Mont. 82, 48 P.3d 749 (noting that this is the minority rule).

¶58 The mere use of the land for the required statutory period, however, is generally insufficient to give rise to the presumption of a grant. *Heller*, ¶ 14; *see also Albert*, ¶ 20 (occasional recreational use is insufficient to raise the presumption of adverse use); *Leisz v. Avista Corp.*, 2007 MT 347, ¶ 16, 340 Mont. 294, 174 P.3d 481 (unexplained use cannot form a basis for a claim of prescriptive right). Generally some circumstances or act, in addition to the use, tending to indicate that the use was not merely permissive, is required. *Heller*, ¶ 14. To be adverse, the use of the alleged easement must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to, and acquiesced in by, the owner of the land. *Kessinger v. Matulevich*, 278 Mont. 450, 457, 925 P.2d 864, 868 (1996). We have repeatedly held that a landowner should not be forced to give up title to his property without notice of the alleged adverse claim and the opportunity to know that his title is in jeopardy. *Amerimont, Inc. v. Gannett*, 278 Mont. 314, 324, 924 P.2d 1326, 1333 (1996).

¶59 Use of a neighbor's land based on neighborly accommodation or courtesy is not adverse and cannot ripen into a prescriptive easement. *Heller*, ¶ 14. This Court has consistently reaffirmed this doctrine. *See Public Lands Access Assn. v. Boone and Crockett Club Found.*, 259 Mont. 279, 284, 856 P.2d 525, 528 (1993); *Lemont Land Corp. v. Rogers*, 269 Mont. 180, 186, 887 P.2d 724, 728 (1994); *Amerimont*, 278 Mont. at 324, 924 P.2d at 1333; *Kessinger*, 278 Mont. at 457, 925 P.2d at 869; *Tomlin Enters. v. Althoff*, 2004 MT 383, ¶ 18, 325 Mont. 99, 103 P.3d 1069. Neighborly accommodation,

39

express or implied, is a form of permissive use which, by custom, does not require permission at every passing. *Heller*, ¶ 14; *Kessinger*, 278 Mont. at 457, 925 P.2d at 868-69. If a use begins as a permissive use, it is presumed to continue as such, and periodic express grants of permission are not required to maintain the permissive character of the use, especially where the use remains essentially the same. *Rettig v. Kallevig*, 282 Mont. 189, 196, 936 P.2d 807, 811 (1997); *Rathbun v. Robson*, 203 Mont. 319, 322-24, 661 P.2d 850, 852 (1983).

¶60 In the present case, the District Court found that the Richardsons' use of the corrals and surrounding area was permissive. While the Richardsons contend there is no testimony substantiating this determination, we conclude the District Court's finding is supported by substantial evidence in the record. The testimony of Judith Anderson, Alex Polakow, Cliff Larsen, and Lorna Richardson, as well as the correspondence between the Larsens and the Richardsons prior to the filing of this lawsuit, indicate that Pope accommodated the Richardsons by giving them permissive use of his property for the ingress and egress of their cattle and by allowing the Richardsons to use the corrals located on his property. This use began as a neighborly accommodation in the 1940s because it was more convenient for the Richardsons to load and offload cattle at that location and it would have been "very expensive" for the Richardsons to create an access point to their property along LaValle Creek Road north of the corrals. The record further reflects that Anderson allowed this permissive use to continue while she owned the property (until 2003). The Richardsons admittedly viewed the corrals as "community corrals" used by themselves, Dougherty, and others.

¶61    The Richardsons' challenges to the District Court's analysis boil down to simple disagreement with the court's credibility determinations and their view that the testimony at trial supports a finding of adverse use.  As we have said, however, we review a trial court's findings "to determine whether substantial evidence supports those findings, *not contrary findings*." *Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶ 78, 334 Mont. 237, 146 P.3d 759 (emphasis in original).  Moreover, it is the province of the trial court to weigh the evidence and resolve any conflicts between the parties' positions, and this Court will not second-guess the court's determinations regarding the strength and weight of conflicting testimony. *Montanans for Justice*, ¶ 78.  Due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses.  M. R. Civ. P. 52(a).  Here, the District Court evaluated the strength and weight of the conflicting testimony, judged the credibility of the witnesses, and determined that the Richardsons' use was permissive.  Substantial evidence supports this determination.

¶62    We accordingly hold that the Richardsons do not hold a prescriptive easement over any part of the Larsens' 9.74 acres north of the B-to-A fence.

¶63    ***Issue 3.  Did the District Court err in denying the Larsens' request for attorney's fees?***

¶64    Following the District Court's entry of its Findings of Fact and Conclusions of Law and Order, the Larsens filed a motion to assess attorney's fees under § 25-7-105, MCA.  This statute provides, in pertinent part, that at any time more than 60 days after service of the complaint and more than 30 days before the trial begins, any party may serve upon the adverse party a written offer to settle a claim for the money or property or

to the effect specified in the offer.  An offer not accepted is considered withdrawn.  If the final judgment is less favorable to the offeree than the offer, then the offeree shall pay the costs, including reasonable attorney's fees, incurred by the offeror after the offer was made.  The statute applies to an action or claim which involves real property and for which the amount contained in a pleading is $50,000 or less, exclusive of costs, interest, and service charges.  Section 25-7-105(1), (3), (4)(b), MCA.

¶65    In September 2008, well over 60 days after service of the Larsens' complaint, the Larsens served upon the Richardsons a written offer to settle.  They offered to create an agricultural easement over a 73-foot-wide strip of land, approximately 0.62 acres in size, along the north side of the B-to-A fence.  The easement would "allow the Richardsons access from LaValle Creek Road to their property to the west of Larsens" and would "allow egress and ingress for livestock and equipment in support of raising livestock." The Richardsons rejected the offer.  The case proceeded to trial in September 2009, after which the District Court ruled that the Richardsons neither own the disputed 9.74 acres nor hold an easement over any part of that property.  Accordingly, the Larsens argued in their motion to assess attorney's fees that the final judgment was less favorable to the Richardsons than the offer of a 0.62-acre agricultural easement and that the Larsens, therefore, were entitled to recover their attorney's fees incurred after the offer was made.

¶66    It is important to note the factual circumstances which existed at the time the Larsens offered to settle.  They commenced this lawsuit on July 10, 2007, seeking to quiet title to the 26.96-acre finger of land.  On August 3, 2007, the Richardsons filed their Answer and Counterclaim, requesting a declaration of prescriptive easement "over that

42

portion of the subject property which includes the corrals, fences, and adjacent grounds."
On February 7, 2008, the Richardsons filed a motion to amend the scheduling order to give their recently retained expert (Milam) time to analyze COS 5900 and the property at issue. On June 25, 2008, Milam issued his report, concluding that the Richardsons own the northernmost 9.74 acres. On September 10, 2008, the Larsens made their offer to settle, which the Richardsons rejected five days later. On September 17, 2008, the Richardsons filed a motion to amend their Answer and Counterclaim to include a claim of ownership. The District Court granted the motion. On December 2, 2008, the Richardsons filed an Amended Answer and Counterclaim, asserting ownership of the 9.74 acres and, in the alternative, a prescriptive easement over the entire 9.74 acres.

¶67     The only claims existing when the Larsens made their offer were the Larsens' request that title to the 26.96 acres be quieted in their names and the Richardsons' counterclaim for a prescriptive easement "over that portion of the subject property which includes the corrals, fences, and adjacent grounds." Accordingly, in their reply brief in support of their motion to assess attorney's fees, the Larsens stated that their offer was directed at the Richardsons' prescriptive easement counterclaim. In the motion itself, however, the Larsens sought to recover attorney's fees "arising in the case after the Defendants' rejection of the Offer of Settlement." Neither their motion nor their attached affidavit distinguishes, in any apparent fashion, between the attorney's fees incurred with respect to the prescriptive easement counterclaim and the attorney's fees incurred with respect to the subsequently filed ownership counterclaim. Yet, the Larsens' offer did not apply to the ownership counterclaim, since that counterclaim had not yet been alleged.

¶68 These factual circumstances raise some important questions concerning the proper application of § 25-7-105, MCA. Is a party entitled to recover attorney's fees incurred in the litigation of a claim or counterclaim that is added to the case *after* the settlement offer is made? In other words, may the Larsens recover attorney's fees incurred on the ownership counterclaim, even though their offer did not pertain to this claim (since it did not exist at the time the offer was made)? Does it depend on whether the original claim (the one for which the offer was made) and the later-added claim (the one added after the offer was made) are of such nature that all of the attorney's fees would have been incurred regardless of whether the later claim had been added? What if, in their Amended Answer and Counterclaim, the Richardsons had dismissed their prescriptive easement claim and pursued only their ownership claim? Is the dispositive fact the fact that this litigation, at its core, has always been about the Larsens' attempt to disperse any and all clouds upon their title to the 26.96-acre property, whatever form that cloud might take (an easement claim, a possessory claim, or some other encumbrance)?

¶69 The parties have not briefed these questions. The Larsens assume they are entitled to *all* attorney's fees incurred after September 10, 2008, while the Richardsons argue that the Larsens' claim fails for another reason. Because we agree with the Richardsons' argument, we leave resolution of the foregoing questions to another case in which they have been properly argued and briefed. We shall assume, for purposes of the present case, that the Larsens may be entitled to recover attorney's fees incurred litigating both the prescriptive easement issue and the ownership issue.

¶70 There is no question that the claims in this case involve real property. Section 25-7-105(4)(b), MCA. There also is no question that the offer to settle otherwise satisfies the criteria of the statute, with the exception of the amount in controversy. By its terms, the statute "applies only to an action or claim for which the amount contained in a pleading is $50,000 or less, exclusive of costs, interest, and service charges." Section 25-7-105(4), MCA. As an initial matter, we agree with the Larsens and the Richardsons that parties cannot be allowed to manipulate the application of § 25-7-105, MCA, by stating in their pleadings an amount above or below $50,000 (regardless of the true value of the property at issue), or by not stating an amount at all, in order to avoid the statute's application or in order to apply it to situations that the Legislature never intended. The statute is designed to encourage the settlement of lawsuits involving real property[13] where the amount in controversy is not more than $50,000. Hence, "the amount contained in a pleading"—to which the $50,000 limit applies—refers to the value of the real property interest that is at issue in the particular claim or claims to be settled.

¶71 As the moving party, therefore, it was incumbent on the Larsens to show that the value of the subject property (the 9.74 acres), the value of the prescriptive easement claimed by the Richardsons, or the value of both (given that the Larsens claim attorney's fees for litigating both the ownership claim and the easement claim) was not more than $50,000. As the Richardsons point out, however, and as the District Court observed in denying the Larsens' motion, the parties "provided no evidence establishing the market value of their claimed property rights in the disputed parcel of land." Accordingly, we

---

[13] It also applies to contract claims. Section 25-7-105(4)(a), MCA.

45

hold that the Larsens did not meet their burden under § 25-7-105(4), MCA, and that the District Court correctly denied their motion for attorney's fees due to a failure of proof.

¶72 ***Issue 4. Did the District Court err in denying the Larsens' request for certain costs?***

¶73 Following the District Court's entry of its Findings of Fact and Conclusions of Law and Order, the Larsens filed a Bill of Costs. The District Court granted some of the requested costs and denied others. The Larsens' arguments on appeal relate to the costs associated with preparing maps and surveys.

¶74 Section 25-10-201(8), MCA, provides that a party is entitled to include in their bill of costs "the reasonable expenses for making a map or maps if required and necessary to be used on trial or hearing." This Court has held repeatedly that expenses incurred in preparing maps, surveys, and charts for the purpose of explaining the factual situation to the court are allowed as recoverable costs. *See Johnson v. Jarrett*, 169 Mont. 408, 417, 548 P.2d 144, 149 (1976); *Funk v. Robbin*, 212 Mont. 437, 449, 689 P.2d 1215, 1222 (1984); *Goodover v. Lindey's Inc.*, 255 Mont. 430, 443-44, 843 P.2d 765, 773 (1992).

¶75 The District Court denied costs for maps and surveys in this case for two reasons. First, the court observed that COS 5900 was prepared prior to the filing of this lawsuit and, thus, the costs related to the preparation of COS 5900 were not recoverable. Second, citing *Witty v. Pluid*, 220 Mont. 272, 714 P.2d 169 (1986), the court observed that expert witness fees are limited to $10.00 per day for each day the expert testifies.

¶76 The error in this analysis, as the Larsens point out, is that they are not claiming costs for the preparation of COS 5900 and are not claiming expert witness fees. Rather,

46

they are claiming costs for the preparation of additional and supplemental maps for purposes of trial. They note that the bills submitted by WGM Group (Weatherly's firm) include charges for additional survey work and for preparing additional maps to explain to the court the facts at issue. While the Richardsons submit that none of these maps were required or necessary to be used at trial, the record belies this contention. The transcript is replete with references by counsel, various witnesses, and the trial judge to points on the supplemental maps prepared by Weatherly. These maps were introduced into evidence; in fact, one of them is included among the Richardsons' own trial exhibits. Furthermore, this case revolved around two surveyors' contradictory conclusions about the location of the boundary line at issue. To explain how they reached their respective conclusions, numerous maps, diagrams, and photographs were introduced at trial. There was exhaustive testimony regarding deeds that refer to fences, jogs, and roads and that contain bearings and distances which do not precisely line up with existing ground conditions. The maps and surveys created by Weatherly provided important details not included in COS 5900, were critical for an understanding of Weatherly's and Milam's differing interpretations of the deeds, and assisted the court in determining the existence and location of the boundary line at issue.

¶77   Accordingly, pursuant to § 25-10-201(8), MCA, the Larsens are entitled to costs for the reasonable expenses incurred in preparing the additional maps and surveys for purposes of trial. The District Court's June 9, 2010 Opinion and Order re: Attorney's Fees and Costs is reversed to this limited extent, and the case is remanded to the District Court for further proceedings on this one issue.

47

¶78 The Richardsons contend that some of the charges included in the WGM Group invoices do not relate specifically to the preparation of maps. We agree that any charges which were not incurred specifically in making the additional maps and surveys are not recoverable under § 25-10-201(8), MCA. But this is a factual matter to be resolved by the District Court on remand.

## CONCLUSION

¶79 The District Court did not err in determining that the Larsens own the disputed 9.74 acres and that the Richardsons do not hold a prescriptive easement over the property. The District Court also did not err in denying the Larsens' request for attorney's fees under § 25-7-105, MCA. The District Court did err, however, in denying the Larsens' request for costs under § 25-10-201(8), MCA. The case is remanded for further proceedings on that issue—specifically, for a determination and award of the reasonable expenses incurred in the preparation of supplemental maps and surveys (i.e., other than COS 5900 itself) for purposes of trial. As a final matter, we hold that the Larsens are entitled to costs on appeal pursuant to Rule 19(3)(a) of the Montana Rules of Appellate Procedure, which the District Court is directed to determine on remand.

¶80 Affirmed in part, reversed in part, and remanded for further proceedings.

/S/ JAMES C. NELSON

We Concur:


/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE