
DA 12-0281

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 99

MOUNTAIN WEST BANK, N.A.,

        Plaintiff and Appellee,

    v.

CHERRAD, LLC, MERRITT & MARIE,
LLC, MAX & V, LLC, CONRAD M.
HALE, CHERYL HALE, MARK OLSON,
THE ESTATE OF CRAIG KINNAMAN,
and John Does 1 through 10,

        Defendants and Appellees.

CHERRAD, LLC, MERRITT & MARIE,
LLC, MAX & V, LLC, CONRAD M.
HALE, and CHERYL M. HALE,

        Cross-Claimants and Appellees,

    v.

ESTATE OF CRAIG KINNAMAN,

        Cross-Claimant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. CDV-2008-48
                Hon. Kathy Seeley, Hon. Thomas C. Honzel, Presiding Judges

COUNSEL OF RECORD:

        For Appellant:

                James Kommers, Kommers Law Firm, Bozeman, Montana

        For Appellee Mountain West Bank:

Amy Randall, Mountain West Bank, N.A.; Helena, Montana

For Appellees Cherrad, LLC, Merritt & Marie, LLC, Max & V, LLC, Conrad and Cheryl Hale:

Candace Payne, Luxan & Murfitt; Helena, Montana

_____

Submitted on Briefs:   February 20, 2013

Decided:   April 16, 2013

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    The Estate of Craig Kinnaman (the Estate) appeals from an order of the First Judicial District Court, Lewis and Clark County, granting summary judgment to Cherrad, LLC (Cherrad), Merritt & Marie, LLC (Merritt & Marie), Max & V, LLC (Max & V), and Conrad and Cheryl Hale (the Hales) (collectively "the Hale interests") and Mountain West Bank (MWB) and declaring the Estate's construction lien invalid.  The Estate also appeals from the final judgment of the First Judicial District Court, Lewis and Clark County, determining Cherrad owes the Estate the sum of $76,278 for work that Craig Kinnaman (Kinnaman), dba CK Design and Construction (CK Design), performed on a condominium construction project.  We affirm.

¶2    We review the following issues on appeal:

¶3    *Issue One:  Did the District Court err when it granted summary judgment to the Hale interests and MWB, determining that the Estate's construction lien was invalid due to its failure to comply with § 71-3-535, MCA?*

¶4    *Issue Two:  Did the District Court err when it calculated the amount of money Cherrad owed the Estate for costs related to the condominium construction project?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    This case arises out of several business transactions entered into by parties involved in the development of condominiums at Lakeside Village on Hauser Lake, Lewis and Clark County, Montana.  Cherrad, Merritt & Marie, and Max & V are Montana limited liability companies owned by the Hales.  Kinnaman was sole proprietor of a business called CK

3

Design. In 2003, Merritt & Marie purchased the Hauser Lake property. The following year, the Hales and Kinnaman discussed plans to develop a portion of the property. The plans involved construction of twelve condominiums—the Lakeside Village Condominiums—in six buildings, a full-service marina, a road and sewer system. Cherrad was to be the developer.

¶6 MWB was Cherrad's lender for purposes of developing the condominium project. MWB made three loans to Cherrad. The first loan was made on April 20, 2006 in the principal amount of $1,385,215. The second loan, a letter of credit, was made on July 26, 2006 for the maximum principal amount of $78,602.22. The third loan was made on May 18, 2007 in the principal amount of $152,319. All three loans were secured by the Hauser Lake property and guaranteed by Merritt & Marie, Max & V, and the Hales.

¶7 Before making any of these loans to Cherrad, MWB required Cherrad and CK Design to execute a formal construction contract to secure financing. Accordingly, Cherrad and CK Design entered into two contracts—"AIA contracts"—in the spring of 2006. The first contract governed the construction of the condominium buildings. It provided that CK Design would build two condominium buildings for $650,000 each, for a total of $1.3 million, plus a 10% management fee. The buildings were to be substantially completed within 180 days of execution of the contract. The second contract governed the construction of the condominium infrastructure and the marina. It provided that Cherrad would pay CK Design $1,323,600 plus a 10% management fee. The contract required substantial completion of the work within 365 days of the date of the contract.

4

¶8     The AIA contracts provided multiple provisions that were not followed by the parties, including those describing the method of payment from Cherrad to CK Design. Specifically, the AIA contracts provided that CK Design would submit bi-weekly invoices to Cherrad, through the project's architect, which would detail the costs incurred by CK Design. Cherrad would then make progress payments to CK Design within a specified period of time. The contracts also provided that with each invoice CK Design would submit a partial release of liens.

¶9     CK Design began construction on the infrastructure project in late 2004 and on the condominiums in late summer 2005. Rather than Cherrad paying CK Design as invoices were submitted, as agreed to in the AIA contracts, the parties engaged in a practice where CK Design was paid as the units sold. Unit 1 was sold in October 2006 for $625,000, and CK Design was paid $350,000 from these proceeds. Unit 4 was sold in March 2007 for $630,512, and CK Design was paid $300,000 from these proceeds. The reason CK Design was not paid the $350,000 for unit 4 that it was paid for unit 1 was because CK Design was behind schedule and the marina was not complete at the time of sale—it was only approximately two-thirds complete.

¶10    CK Design continued to suffer delays in the project, and several subcontractors and suppliers began filing liens on the property claiming they had not yet been paid for their work. As a result, MWB refused to further finance the project unless CK Design and Cherrad entered into an agreement shielding MWB's first security position from the liens of subcontractors and suppliers. Accordingly, on May 18, 2007, MWB, CK Design, Cherrad

5

and the Hales, individually, entered into a "Subordination Agreement" in which CK Design agreed to subordinate its interest in the condominium project, including its right to file a construction lien, to MWB.

¶11  Prior to completion of building two, CK Design began construction of building three, containing units 5 and 6. This work was not covered by a written contract. Not long after, on July 28, 2007, Conrad Hale told Kinnaman that CK Design could no longer proceed on the condominium project; CK Design left the project at that time.

¶12  The parties entered into another agreement on September 6, 2007, entitled "Agreement Regarding Outstanding Debts." The agreement provided that any construction liens on unit 2 would either be paid in full before the closing of the sale of unit 2 or paid from the proceeds of the sale of unit 2 before any funds were dispersed to CK Design or Cherrad. In the agreement, Kinnaman provided a list of all outstanding debts on the construction project—not just on unit 2. Kinnaman warranted that the total amount owed to subcontractors and suppliers was approximately $180,731.

¶13  Unit 2 was sold to a third party in September 2007 for $700,000. Pursuant to the Agreement Regarding Outstanding Debts, all of the unpaid subcontractors, suppliers, and creditors were paid first. The amount owed to unpaid subcontractors and suppliers was actually $223,898, approximately $50,000 more than the figure Kinnaman warranted on the agreement. Out of the remaining funds, Cherrad was paid $63,739.18 and the Estate was paid the leftover funds of approximately $57,360.

6

¶14 Unit 5 was sold to a third party "as is" in October 2008 for $225,635. Unit 6 was sold to a third party "as is" in October 2008 for $212,132. Unit 3 was sold to a third party in February 2010 for $325,000. CK Design never completed construction on any of these units. CK Design received nothing from the sale of units 3, 5, and 6.

¶15 Kinnaman committed suicide in September 2007. On November 29, 2007, the Estate recorded with the Lewis and Clark County Clerk and Recorder a $3.3 million construction lien on the Lakeside Village Condominiums. This was done through Nancy Kinnaman (Nancy), Kinnaman's widow and the personal representative of the Estate. The $3.3 million lien was supported by an attached summary of invoices prepared by CK Design that alleged unpaid costs of labor and materials due to CK Design for the condominium project. The amount of the lien made it impossible for Cherrad to borrow money to continue the development of the condominium project.

¶16 MWB brought this action on January 14, 2008, against the Hale interests and the Estate.[1] MWB sought foreclosure on the three secured loans that MWB made to Cherrad that were guaranteed by Merritt & Marie, Max & V, and the Hales. Although Cherrad was not behind on any payments of its loan to MWB, MWB alleged it was adversely affected and insecure because of the Estate's $3.3 million construction lien against the real property that secured the loans that were the subject of the action. MWB also requested that the District Court declare the Estate's construction lien inferior to the secured interests of MWB.

_____

[1] Mark Olson, a contractor who filed a construction lien against Lakeside Village Condominiums, was also originally a defendant in the action. He was subsequently

7

¶17    The Hale interests filed an answer and cross-claim against the Estate for slander of title and intentional interference with contract.[2] The Estate filed an answer, counter-claim, and cross-claim against the Hale interests alleging various claims including breach of contract and unjust enrichment. MWB and the Hale interests each moved for summary judgment against the Estate. They argued the Estate's construction lien was invalid because it failed to comply with the statutory requirements of § 71-3-535, MCA, and was not based on the personal knowledge of Kinnaman because Nancy filed the lien.

¶18    On September 17, 2008, the District Court granted the motions for summary judgment and declared the construction lien invalid. The court determined that because the Estate failed to include all the requisite information under § 71-3-535(3), MCA, the Estate did not comply with the procedural requirements for a valid construction lien.

¶19    The Estate's counterclaim against MWB was subsequently dismissed by the District Court. The cross-claims made between the Hale interests and the Estate proceeded to bench trial on November 7-8, 2011. At trial, the parties presented evidence and witness testimony to the court. Among several witnesses was Fred Flanders, an expert for the Hale interests. Flanders has worked in the banking industry for over forty years. Flanders discussed the effect of the delay in the development of the condominiums. He testified that had the timeline in the AIA contracts been followed, the units would have been available for sale at

dismissed after MWB settled his construction lien.
    [2] The Hale interests also filed a third-party complaint against Nancy alleging various claims that are not at issue in this appeal. Thus, they will not be discussed further.

8

the peak of the market; instead, the delay resulted in much reduced sales prices. He also testified that the construction lien filed in this case caused the project to come to a standstill and restricted Cherrad's ability to sell any of the units that were covered by the lien.

¶20 Krista Mach, the former bookkeeper for CK Design, testified for the Estate. Among other duties, Mach was responsible for preparing invoices for work that was performed by CK Design for the Lakeside Village project. Mach testified that CK Design regularly received invoices from vendors on the project. Mach stated she would use the information from the invoices to create new invoices to send to Cherrad. Forty-one invoices were admitted. Three lien releases were admitted as well, indicating that some of the invoices had been paid.

¶21 The District Court entered its findings of fact, conclusions of law and order on March 22, 2012. The court determined that multiple provisions of the AIA contracts were disregarded by the parties and that the practice for paying CK Design for building the condominium units was as follows: CK Design was to be paid $350,000 from the sale of each unit as the unit closed. CK Design was expected to pay all subcontractors and suppliers from its share of the proceeds of the sale.

¶22 The court determined the parties' course of conduct established by the distribution of sale proceeds from units 1, 2, and 4 was the best evidence of the agreement between the parties, and that payment to CK Design for the sale of units 3, 5, and 6 did not conform to this practice. The court therefore found that CK Design was entitled to be paid some amount for units 3, 5, and 6. The court reasoned that because no further amounts were owed on

materials for units 3, 5, and 6—these amounts were paid pursuant to the Agreement Regarding Outstanding Debts—a fair price to award CK Design was 10 percent of the units' selling prices. Accordingly, the court ordered Cherrad to compensate the Estate in the amount of $76,278.

¶23 In reaching its conclusion, the court analyzed the 41 invoices prepared by Mach, finding each one was supported by copies of bills, statements, invoices, and hours of labor incurred by CK Design from December 27, 2004 to July 5, 2007. The court found the invoices appeared to "generally support the amount of the $3.3 million construction lien . . . ." However, it recognized the amount was "astronomically higher" than the amount of $180,731 that Kinnaman warranted owing on September 6, 2007. The court also pointed out that the $3.3 million, if accurate, would mean that CK Design was roughly $1.5 million over the contract price set forth in the AIA contracts. The court found that CK Design did not timely, or ever, complete the condominium project. Although the amount of the construction lien was supported by the invoices provided by CK Design, the court concluded the invoices were "difficult to credit" and the lien was "not supportable given the warranty made by Craig Kinnaman on September 6, 2007 and the practice of the parties regarding payment to CK Design."

¶24 The Estate appeals the District Court's order granting summary judgment to MWB and the Hale interests and its final judgment awarding the Estate $76,278.

**STANDARD OF REVIEW**

10

¶25 We review the grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria used by the district court. *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 10, 364 Mont. 175, 272 P.3d 66. Summary judgment is appropriate when the moving party establishes both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. *Dubiel*, ¶ 10.

¶26 We review a district court's findings of fact to determine whether they are clearly erroneous. *Dubiel*, ¶ 10. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Larsen v. Richardson*, 2011 MT 195, ¶ 25, 361 Mont. 344, 260 P.3d 103. In determining whether substantial evidence supports the district court's findings, we view the evidence in the light most favorable to the prevailing party. *Larsen*, ¶ 25.

¶27 We review an award of damages to determine whether the trial court abused its discretion. *Wohl v. City of Missoula*, 2013 MT 46, ¶ 28, 369 Mont. 108 __ P.3d __. A district court's determination of damages is a factual finding that must be upheld if it is supported by substantial evidence. *Lewistown Miller Constr. Co. v. Martin*, 2011 MT 325, ¶ 16, 363 Mont. 208, 271 P.3d 48. We will not overturn a district court's determination of damages unless it is clearly erroneous. *Lewistown*, ¶ 16. We review a district court's conclusions of law for correctness. *Lewistown*, ¶ 17.

## DISCUSSION

11

¶28 *Issue One: Did the District Court err when it granted summary judgment to the Hale interests and MWB, determining that the Estate's construction lien was invalid due to its failure to comply with § 71-3-535, MCA?*

¶29 The Estate challenges the District Court's interpretation of Montana's construction lien statutes and argues the court erred in its determination that the Estate's $3.3 million construction lien was invalid. In response, the Hale interests contend the issue of the validity of the construction lien is moot because the properties formerly encumbered by the lien have been purchased, for value, by third parties in good faith. Accordingly, the Hale interests assert we should avoid ruling on the issue. We agree.

¶30 We have explained many times that the judicial power of Montana courts is limited to justiciable controversies, which are controversies that can be disposed of and resolved in the courts. *Gateway Opencut Mining Action Group v. Bd. of Co. Commrs.*, 2011 MT 198, ¶ 16, 361 Mont. 398, 260 P.3d 133. Among several central concepts of justiciability is mootness. *Gateway Opencut*, ¶ 16. A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy. *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, 974 P.2d 1150. In deciding whether a matter is moot, we determine whether the court can grant effective appellate relief. *Not in Mont.: Citizens Against CI-97 v. State*, 2006 MT 278, ¶ 7, 334 Mont. 265, 147 P.3d 174. Mootness is a threshold issue which must be resolved before addressing the substantive merits of a dispute. *Progressive Direct Ins. Co. v. Stuivenga*, 2012 MT 75, ¶ 17, 364 Mont. 390, 276 P.3d 867.

12

¶31 The Estate argues that since MWB failed to present the issue of mootness before the District Court and raises it now for the first time on appeal it should be dismissed. Regardless of whether this issue was brought before the District Court, this Court has an independent obligation to determine whether jurisdiction exists and, thus, whether constitutional justiciability requirements, such as mootness, have been met. *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 11, 355 Mont. 142, 226 P.3d 567. This Court lacks jurisdiction over non-justiciable matters; thus, if a matter is moot it exceeds our jurisdiction. *Not in Mont.*, ¶ 7. If we determine we lack jurisdiction, we may take no further action in the matter other than to dismiss it. *Plan Helena,* ¶ 11. It is therefore necessary we determine as a preliminary matter whether this issue is moot.[3]

¶32 The District Court invalidated the Estate's construction lien in its September 17, 2008 order. Since then, the Estate has failed to take any action to seek a stay of the order or an injunction to prevent the sale of the property. *See* M. R. App. P. 22. Although a party is not required to seek a stay of execution, a party choosing not to seek such a stay runs the risk of having the appeal become moot. *Progressive*, ¶ 45. We have previously warned against the "'particular danger of dismissal for mootness' where the sale of property to a third party is involved." *Charlotte Mills, Clerk & Recorder v. Alta Vista Ranch*, 2008 MT 214, ¶ 22, 344 Mont. 212, 187 P.3d 627 (quoting *Turner v. Mt. Engr. and Constr., Inc.*, 276 Mont. 55, 63,

---

[3] Additionally, we point out that at the time of the District Court's order granting summary judgment and declaring the construction lien invalid, the properties were not yet sold, and mootness not yet an issue. When the case went to bench trial, the lien had already been declared invalid and was not an issue before the court. Therefore, a

915 P.2d 799, 804 (1996)). In such circumstances there is a "'special need for seeking a stay.'" *Charlotte Mills*, ¶ 22 (quoting *Turner*, 276 Mont. at 63, 915 P.2d at 804).

¶33 Here, each of the units named in the construction lien—units 2, 3, 5, and 6—have been sold to third-party purchasers in good faith. Each of these purchasers took title to the units free of any encumbrances placed upon them by the Estate. Even if we were to agree with the Estate that the District Court incorrectly determined the construction lien was invalid, there is no effective relief we can grant to the Estate at this point without implicating the validity of the third-party sales. Therefore, the sale of the property to bona fide third parties renders moot the Estate's claim regarding the validity of its lien.

¶34 *Issue Two: Did the District Court err when it calculated the amount of money Cherrad owed the Estate for costs related to the condominium construction project?*

¶35 As noted above, the District Court rejected the Estate's $3.3 million claim and instead ordered Cherrad to pay the Estate $76,278. The Estate argues the District Court misapprehended the effect of the evidence of the amount CK Design owed to its suppliers. Specifically, the Estate claims the District Court erroneously reasoned that because CK Design mistakenly represented by $50,000 the amount owed to its suppliers, Cherrad did not owe CK Design the $3.3 million amount of the lien. The Estate argues the District Court abused its discretion when determining that Cherrad does not owe CK Design the $3.3 million amount in the construction lien.

---

mootness argument would not have been relevant to the case before the District Court.

14

¶36 First, the Estate's interpretation of the court's factual findings is incorrect. In its finding of fact number 44, the court stated:

> Krista Mach, CK Design's bookkeeper, identified 41 invoices she prepared and mailed to Cherrad at 5295 York Road, Helena, Montana. Each invoice was supported by copies of bills, statements, invoices, and hours of labor incurred by CK Design from December 27, 2004 to July 5, 2007. The invoices appear to generally support the amount of the $3.3 million construction lien filed by Nancy Kinnaman as personal representative for the Estate, even considering amounts over $1.2 million that Cherrad had paid CK Design for the infrastructure and buildings. Nonetheless, that amount is astronomically higher than the amount Craig Kinnaman warranted was owing on September 6, 2007. It would also mean that CK Design[] was around $1.5 million over the contract price set forth in the AIA contracts prepared by Craig Kinnaman. The invoices are therefore difficult to credit. Testimony at trial also established that CK Design did not timely, or ever, complete the infrastructure or any of the condominium units.

The court further provided in its finding of fact number 64:

> As noted above, the amount of the construction lien filed by Nancy Kinnaman as personal representative of the Estate is not supportable given the warranty made by Craig Kinnaman on September 6, 2007 and the practice of the parties regarding payment to CK Design. However, the amount of the lien was supported by the invoices found at the offices of CK Design.

¶37 Contrary to what the Estate asserts, the District Court did not determine that CK Design's inaccurate reporting of outstanding debts was the reason CK Design was not awarded $3.3 million. Rather, it found that while the invoices generally supported the amount of the construction lien, other evidence undermined their credibility. This evidence included the contract price originally agreed to in the AIA contracts, the parties' course of conduct regarding payment to CK Design, CK Design's failure to finish the project, and the amount CK Design warranted to owing subcontractors and suppliers in September 2007.

15

¶38 The District Court was in the best position to judge the credibility of testimony and proffered evidence, and as such, we will defer to its resolution of conflicting evidence. *In re Marriage of Haberkern*, 2004 MT 29, ¶ 34, 319 Mont. 393, 85 P.3d 743. We will not substitute our judgment for that of the District Court if there is evidence to sufficiently support a factual finding, even where there is evidence in the record to support contrary findings. *Trad Indus., Ltd. v. Brogan*, 246 Mont. 439, 447, 805 P.2d 54, 59-60 (1991). If there is substantial credible evidence to support the lower court's determination, that determination will be upheld. *Trad Indus.*, 246 Mont. at 447, 805 P.2d. at 59.

¶39 Upon a thorough review of the record, we determine there was substantial credible evidence to support the District Court's findings that a proper amount to award CK Design for its work on units 3, 5, and 6 was 10% of the sale prices, and not the $3.3 million supported by the invoices. The court was presented with conflicting evidence from which to calculate the amount owed from Cherrad to CK Design—among them being the amount provided in the AIA contracts, the amount reflected by the invoices, and the amounts paid from prior sales of the units. Although the court looked at the AIA contracts to get an idea of the expected contract price between Cherrad and CK Design, it determined that since many of the contract provisions were ignored by the parties, they were not the best evidence of the parties' agreement. The court likewise determined the invoices were not the best evidence of the parties' obligations. Not only were the invoices for an amount much greater than what the parties had originally agreed to, but they were also much greater than what CK Design had warranted owing subcontractors and suppliers in the Agreement Regarding Outstanding

16

Debts. In this agreement, CK Design warranted that all of the outstanding debts on the project amounted to $180,731. In actuality, the total amount of outstanding subcontractor and supplier debts against the project was $223,898. Because the amount in the invoices was "astronomically higher" than the amount in the agreement, the court found the invoices were difficult to credit. The court therefore determined the parties' conduct was the best evidence of their agreement.

¶40 The parties' conduct did not involve Cherrad paying CK Design for each invoice it received from every subcontractor CK Design owed money. Rather, the parties' practice was for Cherrad to pay CK Design $350,000 from the sale of each unit as it closed, and CK Design was expected to pay all subcontractors from its share of the proceeds of the sale. However, CK Design quickly fell behind schedule and did not timely, or ever, complete construction on the units or the infrastructure. When unit 4 was sold—the second unit to sell—CK Design was paid less from the proceeds because of its untimely work. This demonstrates that the parties' agreement regarding the amount Cherrad would pay CK Design took into consideration whether the work was completed in a timely manner; delays would result in reduced pay. The delays continued and affected the sales of units 3, 5, and 6, which were all sold only partially completed and for a much lower price than units 1, 2, and 4. Since the amounts owed for materials for construction on units 3, 5, and 6 were already paid upon the sale of unit 2, the amount owed to CK Design was for its labor. Given the delays and the fact that CK Design never completed the condominium units and the

17

infrastructure, the District Court's finding that a proper amount to award CK Design for its work on units 3, 5, and 6 was 10% of the sale prices was not clearly erroneous.

¶41 Finally, the Hale interests request attorney fees in the appellate litigation of the construction lien issue pursuant to § 71-3-124(1), MCA. This statute provides:

> In an action to foreclose any of the liens provided for in Title 71, chapter 3, part 3, 4, 5, 6, 8, 10, or 16, the court shall allow as costs the money paid and attorney fees incurred for filing and recording the lien and reasonable attorney fees in the district and supreme courts. The costs and attorney fees must be allowed to each claimant whose lien is established, and the reasonable attorney fees must be allowed to the defendant against whose property a lien is claimed if the lien is not established.

The Estate's lien was filed under Title 71, Chapter 3, Part 5, and therefore § 71-3-124(1), MCA, is applicable. Accordingly, the Hale interests are entitled to reasonable attorney fees incurred in both the District Court and this Court. The District Court has issued an order entitling the Hale interests to its reasonable attorney fees incurred in the District Court. Because the Hale interests were successful in defending against the Estate's lien, we remand for a determination of the Hale interests' reasonable attorney fees incurred in the appellate litigation of the construction lien issue.

## CONCLUSION

¶42 For the reasons stated above, we affirm the District Court's judgment. We remand to the District Court for a determination of the Hale interests' reasonable attorney fees incurred on appeal.

¶43 Affirmed.

18

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE